**Opinion issued August 3, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00260-CV

————————————

**GEORGE T. KUHN, M.D., GEORGE T. KUHN M.D., P.A. D/B/A WOMEN'S HEALTHCARE ASSOCIATES, PAUL JAMES, M.D., METROPOLITAN HOUSTON SURGERY ASSOCIATES, PLLC, ADAM MORALES, M.D., WEST HOUSTON RADIOLOGY ASSOCIATES, L.L.P., AND SINGLETON ASSOCIATES, P.A. D/B/A RADIOLOGY PARTNERS GULF COAST, Appellants**

**V.**

**ANGIE SAM, Appellee**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-45200**

---

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellants, George T. Kuhn, M.D., George T. Kuhn M.D., P.A., doing business as Women's Healthcare Associates ("Women's Healthcare"), Paul James, M.D., Metropolitan Houston Surgery Associates, PLLC ("Metropolitan Houston"), Adam Morales, M.D., West Houston Radiology Associates, L.L.P. ("West Houston Radiology"), and Singleton Associates, P.A., doing business as Radiology Partners Gulf Coast ("Radiology Partners") (collectively, "appellants"), challenge the trial court's order overruling their objections and denying their motions to dismiss the health care liability claims[2] brought against them by appellee, Angie Sam, in her suit for negligence. In multiple issues, appellants contend that the trial court erred in overruling their objections and denying their motions to dismiss Sam's claims against them.[3]

We affirm.

## Background

In her petition, Sam alleges that on April 12, 2018, she was admitted to St. Joseph Hospital with pelvic pain, uterine fibroids, and a right ovarian cyst. Sam underwent an exploratory laparotomy,[4] a lysis of adhesions, a right

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9).

[2] *See id.* § 74.001(a)(13) (defining "[h]ealth care liability claim" (internal quotations omitted)).

[3] *See id.* § 74.351 (governing expert reports).

[4] A "laparotomy" is a "surgical incision of the abdominal wall." *Laparotomy*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2014).

2

salpingo-oophorectomy,[5] and a supracervical hysterectomy.[6] The friable adhesions found during surgery required "sharp and cautery dissection to free the uterus and right [fallopian] tube and ovary for removal." Sam experienced excessive blood loss due to the adhesions which required an "inter-operative blood transfusion." "[A] decision to stop with a supra[cervical] hysterectomy was made." Extensive cautery and suturing were required "to obtain hemostasis." According to Sam, "[t]he frozen section on the ovarian cyst was benign and cystoscopy was normal prior to [the] closing [of her] abdomen." (Internal quotations omitted.)

Soon after surgery, Sam developed pain, fever, nausea, and vomiting. A computed tomography ("CT") scan of Sam's abdomen was done on the third day after her surgery. The CT scan showed "a collection of fluid and [a] probable blood clot in [Sam's] pelvis." A drain was placed by the interventional radiology department, which "noted that 50 cc of brown and bloody fluid was obtained from [Sam's] pelvis at th[e] time." Sam continued to experience pain and fever and

---

[5] A "[s]alpingo-oophorectomy" is the "[surgical] excision of a fallopian tube and an ovary." *See Young v. Pinto*, No. 09-08-299-CV, 2008 WL 4998346, at *8 n.3 (Tex. App.—Beaumont Nov. 26, 2008, no pet.) (mem. op.) (internal quotations omitted).

[6] A "supracervical hysterectomy" is the "surgical removal of the uterus." *See Tex. Tech Univ. of Health Scis. Ctr. v Lozano*, 570 S.W.3d 740, 743 n.1 (Tex. App.—El Paso 2018, pet. denied); *see also Young*, 2008 WL 4993846, at 8 n.3.

leukocytosis.[7] On the sixth day after Sam's surgery, another CT scan was taken, and it showed "air, fluid, and contrast leakage within the peritoneal cavity."[8] After Sam was diagnosed with a bowel perforation, "with evidence of wide spread [sic] peritoneal cavity involvement," a decision was made to treat Sam's bowel perforation conservatively by draining the area even though there was "fluid and bowel gas . . . throughout the peritoneal cavity." This course of treatment continued for the next four days, and Sam's condition continued to deteriorate.

On the tenth day after Sam's initial surgery, Sam underwent an exploratory laparotomy, a repair of her bowel perforation, and a diverting ileostomy.[9] The ileostomy was required because of a "marked inflammatory reaction to bowel leakage" that had occurred for an extended length of time. After Sam's second

---

[7] "[L]eukocytosis" is "an increase in the number of white blood cells in the circulating blood." *Leukocytosis*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2014).

[8] The "peritoneal cavity" is "the space within a person's abdomen that contains the intestines, stomach, and liver." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 510 n.2 (Tex. 2019).

[9] An "ileostomy" is "a surgical operation in which a damaged part is removed from the ileum," the third portion of the small intestine, "and the cut end [is] diverted to an artificial opening in the abdominal wall." *Ileostomy*, OXFORD DICTIONARY OF ENGLISH (2d ed. 2009); *see also Thetford v. State*, No. 02-18-00488-CR, 2021 WL 278913, at *1 n.3 (Tex. App.—Fort Worth Jan. 28, 2021, pet. filed) (mem. op., not designated for publication) (physician described ileostomy as follows: "[W]e essentially brought the small intestine to the skin and bypassed the large intestine, essentially tak[ing] it out of the equation so the small intestine just empties to a bag instead of going through the large intestine." (second alteration in original) (internal quotations omitted)).

4

surgery, she suffered peritonitis and sepsis. Sam's condition slowly improved, and she was discharged from St. Joseph Hospital on April 29, 2018.

Sam brings health care liability claims against appellants, alleging that Sam was their patient and appellants had a duty to act as reasonably prudent health care providers. Drs. Kuhn, James, and Morales breached the applicable standards of care required for treating and caring for Sam in many ways, including, but not limited to, failing to recognize her bowel perforation, failing to diagnose her bowel perforation until the sixth day after her initial surgery, and failing to consult about immediately exploring Sam's abdomen to repair her bowel perforation upon its diagnosis. Sam also alleges that Women's Healthcare, Metropolitan Houston, West Houston Radiology, and Radiology Partners are vicariously liable for the acts and omissions of Drs. Kuhn, James, and Morales. Sam requests damages for past and future physical pain and suffering, past and future mental anguish, past and future physical impairment, past and future medical expenses, past and future disfigurement, loss of earnings, future lost earning capacity, exemplary damages, and interest.

To support her claim, Sam timely served appellants with an initial expert report authored by J.M. Paine, M.D., F.A.C.O.G.[10] Appellants objected to the initial

---

[10] Dr. Paine attached his curriculum vitae ("CV") to his expert report.

expert report, and the trial court signed an agreed order allowing Sam thirty days to supplement or amend Dr. Paine's initial expert report.[11]

Sam timely served appellants with a supplemental expert report authored by Dr. Paine. Dr. Paine's supplemental expert report states that it is "intended sole[ly] to supplement[] [and] not to replace[] [his] prior report."[12]

In his expert reports, Dr. Paine states that he is a licensed physician and is board certified in obstetrics and gynecology. He has been practicing in the field of obstetrics and gynecology for thirty-five years. Currently, he is a member of the teaching faculty as an associate professor in the department of obstetrics and gynecology at the University of Texas Health Science Center in San Antonio, Texas. In his position as an associate professor, he trains residents and students in obstetrics and gynecology. He is also actively practicing medicine in the field of obstetrics and gynecology.

Dr. Paine states that he has extensive experience in the field of obstetrics and gynecology, and he has performed thousands of hysterectomies during his career. He has knowledge of the accepted standards of medical and surgical care required for patients needing hysterectomies. This includes knowledge of the standards of

---

[11]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

[12]     Dr. Paine attached his CV to his supplemental expert report.

pre-operative, inter-operative, and post-operative care required for patients who have hysterectomies.

When Dr. Paine treats patients requiring hysterectomies, he provides pre-operative, inter-operative, and post-operative care to his patients. Post-operative care includes "following [a] patient after [a] surgery is complete[] to diagnose and treat any complications that may arise from the surgical procedure." According to Dr. Paine, this case involves the purported failure of Drs. Kuhn, James, and Morales to appropriately care for and treat Sam after a hysterectomy, and Dr. Paine is familiar with the type of post-operative care a patient, such as Sam, should receive and how post-operative complications, like those experienced by Sam, should be managed and treated.

In his expert reports, Dr. Paine states that on April 12, 2018, Sam was admitted to St. Joseph Hospital with pelvic pain, uterine fibroids, and a right ovarian cyst. She underwent an exploratory laparotomy, lysis of adhesions, right salpingo-oophorectomy, and supracervical hysterectomy. The friable adhesions found during surgery required "sharp and cautery dissection to free the uterus and right [fallopian] tube and ovary [for] removal." Sam experienced excessive blood loss due to the adhesions which required an "inter-operative blood transfusion"; thus, "a decision to stop with a supra[cervical] hysterectomy was made." Extensive cautery and suturing were required "to obtain hemostasis." "The frozen section on

7

the ovarian cyst was benign and cystoscopy was normal prior to [the] closing [of her] abdomen." (Internal quotations omitted.)

Soon after surgery, Sam developed pain, fever, nausea, and vomiting. A CT scan of Sam's abdomen was done on her third day after her surgery. The CT scan showed "a collection of fluid and [a] probable blood clot in [Sam's] pelvis." A drain was placed by the interventional radiology department, which "noted that 50 cc of brown and bloody fluid was obtained from [Sam's] pelvis at th[e] time." Sam continued to experience pain and fever and leukocytosis. On the sixth day after her surgery, another CT scan was taken, and it showed "air, fluid, and contrast leakage within the peritoneal cavity." After Sam was diagnosed with a bowel perforation, "with evidence of wide spread [sic] peritoneal cavity involvement," a decision was made to treat Sam's condition conservatively by draining the area even though there was "fluid and bowel gas . . . throughout the peritoneal cavity." This course of treatment continued for the next four days, and Sam's condition continued to deteriorate.

On the tenth day after her initial surgery, Sam was taken back to the operating room for an exploratory laparotomy, a repair of her bowel perforation, and a diverting ileostomy. The ileostomy was required because of a "marked inflammatory reaction to bowel leakage" that had occurred for an extended length of time. Had an exploratory laparotomy and repair of the bowel perforation been

performed at the time Sam was diagnosed with the bowel perforation, "with evidence of wide spread [sic] peritoneal cavity involvement," a colostomy[13] would have been possible. After Sam's second surgery, Sam suffered peritonitis and sepsis. Sam slowly improved and was discharged seventeen days after she was first admitted to the hospital.

As to the standard of care and breach of the standard of care for Dr. Kuhn, Dr. Paine states that bowel injuries, like a bowel perforation, are a well-known complication of a hysterectomy. On average they occur in one out of every 700 cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases. A bowel perforation should be diagnosed three days after a hysterectomy. Given the difficulties with Sam's hysterectomy and the extensive bowel dissection that was required during her surgery, Dr. Kuhn, Sam's gynecologist, should have considered and suspected a bowel perforation by the third day after Sam's surgery, when Sam was experiencing pain, fever, nausea, and vomiting and a CT scan showed "a collection of fluid and [a] probable blood clot in [her] pelvis." The standard of care required Dr. Kuhn to suspect, recognize, and diagnose a bowel perforation by the

---

[13] A "colostomy" is "where the bowel is diverted to exit the abdomen. A colostomy bag is then attached that permits the [person] to pass stool into the bag, which must be drained by the [person], instead of the normal waste elimination process." *Centocor, Inc. v. Hamilton*, 310 S.W.3d 476, 481–82 (Tex. App.—Corpus Christi–Edinburg 2010), *rev'd on other grounds*, 372 S.W.3d 140 (Tex. 2012).

third day after Sam's initial surgery and it required Dr. Kuhn to take Sam to surgery "to look for and treat the injury." Dr. Kuhn did not do such things, and thus, breached the standard of care.

Additionally, on the sixth day after Sam's surgery, when Sam's bowel perforation was actually diagnosed, the standard of care required Dr. Kuhn to recommend surgery to Sam and to immediately perform surgery to repair the bowel perforation. But Dr. Kuhn did not do either of those things. Instead, he decided to "treat [Sam's] condition conservatively," by draining the fluid that was present. (Internal quotations omitted.) There is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the patient's peritoneal cavity. (Internal quotations omitted.) Dr. Kuhn's failure to take any action to repair Sam's bowel perforation, including a failure to consult with someone from general surgery to explore Sam's abdomen and repair the bowel perforation, after the bowel perforation diagnosis on the sixth day following Sam's initial surgery was a breach of the standard of care. Further, Dr. Kuhn breached the standard of care by waiting until the tenth day after Sam's initial surgery to return Sam to surgery to repair the bowel perforation because it should have been repaired immediately upon its diagnosis.

As to the standard of care and breach of the standard of care for Dr. James, Dr. Paine states that bowel injuries, like a bowel perforation, are a well-known

10

complication of a hysterectomy. On average they occur in one out of every 700 cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases. A bowel perforation should be diagnosed three days after a hysterectomy.

According to Dr. Paine, Dr. James was the general surgeon "following . . . Sam[] post-hysterectomy." Because Dr. James was the general surgeon "following" Sam after her surgery, once Sam's bowel perforation was diagnosed on the sixth day after her surgery, the standard of care required Dr. James to immediately act upon the diagnosis by surgically repairing the bowel perforation or at least recommending a surgical repair of the bowel perforation. But Dr. James did not do so and instead joined in the "conservative" treatment plan with Dr. Kuhn. (Internal quotations omitted.) There is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) By failing to recommend surgical repair of Sam's bowel perforation and by failing to surgically repair the bowel perforation immediately, Dr. James breached the standard of care. Dr. James also breached of the standard of care by waiting until the tenth day after Sam's initial surgery to return Sam to surgery to repair the bowel perforation because it should have been repaired immediately upon its diagnosis.

As to the standard of care and breach of the standard of care for Dr. Morales, Dr. Paine states that bowel injuries, like a bowel perforation, are a well-known complication of a hysterectomy. On average they occur in one out of every 700 cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases. A bowel perforation should be diagnosed three days after a hysterectomy.

According to Dr. Paine, Dr. Morales, an interventional radiologist, "drain[ed] the peritoneal cavity" after Sam was diagnosed with a bowel perforation on the sixth day after her surgery. But there is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) Based on Sam's diagnosis of a bowel perforation on the sixth day after her surgery, Dr. Morales should have recommended immediate surgical exploration and repair of the bowel perforation. Dr. Morales did not do this, and thus, breached the standard of care.

As to causation, Dr. Paine states that because of the aforementioned breaches by Drs. Kuhn, James, and Morales, Sam's condition worsened and endangered her life. A bowel perforation is a surgical emergency that requires immediate intervention. Immediate exploration, wash out of the peritoneal cavity, and repair of the bowel perforation is required. Any course of action other than immediate exploration, wash out, and repair, causes worsening peritonitis, sepsis, and possible

12

death. According to Dr. Paine, the physicians' failure to timely diagnose the bowel perforation, decision to pursue "conservative management" of Sam's bowel perforation after it was diagnosed on the sixth day after her initial surgery, failure to recommend surgical exploration and repair of the bowel perforation upon its diagnosis, failure to immediately repair the bowel perforation upon its diagnosis, and decision to delay the repair of Sam's bowel perforation until the tenth day after her initial surgery, caused Sam's condition to deteriorate and allowed for the continued leakage of bowel contents into the peritoneal cavity. (Internal quotations omitted.) Without a repair of the bowel perforation, bowel contents continued to flow into Sam's peritoneal cavity "with all the bacteria, chemicals[,] and irritants [that] allow[] [an] infection to grow and worsen." The bowel leakage caused severe damage to Sam's physiology and permanent residual damage. And because the infection was allowed to grow, this led to a more complicated recovery process for Sam, a longer hospital stay, and long-term damage. Sam could not recover from the bowel perforation until it was actually repaired.

Dr. Paine also explains that during the surgery to repair Sam's bowel perforation, a diverting ileostomy had to be performed. According to Dr. Paine, the ileostomy was required because of a marked inflammatory reaction to bowel leakage for an extended length of time, i.e., four days after the bowel-perforation diagnosis

13

and ten days after Sam's initial surgery.  Had the bowel perforation been repaired at the time it was diagnosed, a colostomy would have been possible.

Additionally, Dr. Paine states that peritonitis and sepsis, which are life-threatening conditions, can arise from a bowel perforation, and in such cases, they will not be resolved until the bowel perforation is repaired.  Here, because of appellants' aforementioned breaches, Sam's peritonitis and sepsis grew worse—which is what happens when an infection is not properly treated and the source of the infection is not appropriately and timely addressed.

Dr. Kuhn objected to Dr. Paine's expert reports and requested that Sam's health care liability claim against him be dismissed.[14]  Dr. Kuhn asserted that Dr. Paine's expert reports do not provide a fair summary of the applicable standard of care and do not explain how Dr. Kuhn breached the standard of care.  The reports also do not explain how any alleged breach by Dr. Kuhn caused or contributed to cause Sam's injury.

Dr. James objected to Dr. Paine's expert reports and requested that Sam's health care liability claim against him be dismissed.[15]  Dr. James asserted that Dr. Paine's expert reports do not provide a fair summary of the applicable standard of

---

[14] Women's Healthcare joined Dr. Kuhn's objection and requested that the trial court dismiss Sam's vicarious liability health care liability claim against it.

[15] Metropolitan Houston joined Dr. James's objection and requested that the trial court dismiss Sam's vicarious liability health care liability claim against it.

care and do not inform Dr. James of what he did to breach the standard of care. Dr. Paine's opinion on causation is speculative and conclusory, and the reports do not state how Dr. James's breach of the standard of care caused Sam harm. Dr. James also asserts that Dr. Paine is not qualified to offer an opinion on the standard of care and causation related to Dr. James.

Dr. Morales objected to Dr. Paine's expert reports and requested that Sam's health care liability claim against him be dismissed.[16] Dr. Morales asserted that Dr. Paine is not qualified to offer an opinion on causation related to Dr. Morales.

After Sam responded to appellants' objections and motions to dismiss, the trial court overruled appellants' objections to Dr. Paine's expert reports and denied appellants' motions to dismiss the health care liability claims against them.

### Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We apply the same standard to a trial court's determination that an expert is qualified. *See Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex. 1996); *San Jacinto Methodist Hosp. v.*

---

[16] West Houston Radiology and Radiology Partners joined Dr. Morales's objection and requested that the trial court dismiss Sam's vicarious liability health care liability claims against them.

15

*Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). But a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). In conducting our review, we always consider that the Legislature's goal in requiring expert reports is to deter baseless claims, not block earnest ones. *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 81 (Tex. App.—Fort Worth 2018, pet. denied); *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.—El Paso 2016, no pet.); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011).

Under the Texas Medical Liability Act ("TMLA"), a plaintiff asserting a health care liability claim must timely serve each defendant physician and health

care provider[17] with at least one expert report, with a CV for the expert whose opinion is offered, to substantiate the merits of the plaintiff's claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (i); *see also Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The expert report must provide a "fair summary" of the expert's opinions on (1) the applicable standard of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standard of care, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A "fair summary" of the expert's opinions means that, at the least, the report must state more than the expert's mere conclusions as to the standard of care, breach, and causation; it must instead explain the basis of the expert's opinion so as to link the conclusions to the facts of the case. *See Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52.

If a plaintiff fails to timely serve an expert report, then, on the motion of a defendant physician or health care provider, the trial court must dismiss the pertinent health care liability claim with prejudice and award attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018).

---

[17] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(12)(A) (defining "[h]ealth care provider" (internal quotations omitted)).

17

But if a plaintiff timely serves an expert report and a defendant physician or health care provider files a motion challenging the adequacy of that report, then the trial court may only grant the motion "if it appears to the court, after [a] hearing, that the report does not represent an objective good faith effort to comply with the [TMLA's] definition of an expert report." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Baty*, 543 S.W.3d at 692–93; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) ("[e]xpert report" means "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed" (internal quotations omitted)).

An expert report qualifies as an "objective good faith effort" to avoid dismissal if it discusses each element with sufficient specificity so that it (1) informs the defendant physician or health care provider of the specific conduct that the plaintiff questions or about which the plaintiff complains and (2) provides a basis for the trial court to conclude that the plaintiff's health care liability claim has merit. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017); *see also Baty*, 543 S.W.3d at 693–94. The expert report need not use any particular

18

words, and it may be informal, "but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 555–56.

In determining whether an expert report constitutes an "objective good faith effort" to address each element, "a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Puppala v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (internal quotations omitted). And when the issue of adequacy hinges on an expert's qualifications, the trial court may also consider the "four corners" of the expert's CV. *Id.*; *Mangin*, 480 S.W.3d at 706. Courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it is sufficient. *See Baty*, 543 S.W.3d at 694; *see, e.g.*, *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015); *see also Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive."). In reviewing the adequacy of an expert report, a trial court may not consider an expert's credibility, the data relied on by the expert, or the documents that the expert failed to consider at this pre-discovery stage of the litigation. *See Mettauer v. Noble*, 326 S.W.3d 685, 691–92 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez*, 485 S.W.3d at 245.

Multiple expert reports may be considered together in determining whether a plaintiff has provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Salias v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 534 (Tex. App.—Waco 2010, pet. denied); *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186 n.2 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). A single report addressing both liability and causation issues related to a defendant physician or health care provider is not required. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Gannon v. Wyche*, 321 S.W.3d 881, 896 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). When an expert report has been supplemented, a court considers both the original expert report and the supplemental expert report when reviewing their adequacy. *See Scherer v. Gandy*, No. 07-18-00341-CV, 2019 WL 988174, at *2 n.4 (Tex. App.—Amarillo Feb. 28, 2019, no pet.) (mem. op.); *see also Packard v. Guerra*, 252 S.W.3d 511, 527 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The multiple expert reports, when read together, must provide a "fair summary" of the expert's opinions on (1) the applicable standard of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standard of care, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i), (r)(6); *see also Gannon*, 321 S.W.3d at 896.

**Dr. Kuhn and Women's Healthcare**

In his sole issue, Dr. Kuhn argues that the trial court erred in overruling his objections to Dr. Paine's expert reports and denying his motion to dismiss Sam's health care liability claim against him because Dr. Paine's expert reports do not adequately address the standard of care and causation as it relates to Dr. Kuhn. In its sole issue, Women's Healthcare argues that the trial court erred in overruling its objections to Dr. Paine's expert reports and denying its motion to dismiss Sam's vicarious liability health care liability claim against it because Dr. Paine's expert reports do not adequately address the standard of care and causation as it relates to Dr. Kuhn.

**A.     Standard of Care Related to Dr. Kuhn**

In a portion of his sole issue, Dr. Kuhn argues that Dr. Paine's expert reports do not adequately address the standard of care as it relates to him because the expert reports do not "provide Dr. Kuhn with specific information about what he should have done differently."

Identifying the standard of care in a health care liability claim is critical. *Palacios*, 46 S.W.3d at 880. To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant [physician] should have done differently." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018) (internal quotations omitted). Thus, related to standard of care and

breach, the expert report must explain what the defendant physician should have done under the circumstances and what the physician did instead. *Palacios*, 46 S.W.3d at 880; *see also Kline v. Leonard*, No. 01-19-00323-CV, 2019 WL 6904720, at *7 (Tex. App.—Houston [1st Dist.] Dec. 19, 2019, pet. denied) (mem. op.) ("[A]n expert report must provide a fair summary of the expert's opinion regarding the applicable standard of care and the manner in which the care rendered by the health care provider failed to meet the standard." (internal quotations omitted)). It is not sufficient for the expert to simply state that he knows the standard of care and concludes that it was or was not met. *Palacios*, 46 S.W.3d at 880.

As to the applicable standard of care related to Dr. Kuhn, Dr. Paine, in his expert reports, states that bowel injuries, like a bowel perforation, are a well-known complication of a hysterectomy. On average they occur in one out of every 700 cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases. A bowel perforation should be diagnosed three days after a hysterectomy. Given the difficulties with Sam's hysterectomy and the extensive dissection that was required during her initial surgery, Dr. Kuhn, Sam's gynecologist, should have considered and suspected a bowel perforation by the third day after Sam's surgery, when Sam was experiencing pain, fever, nausea, and vomiting and a CT scan showed "a collection of fluid and [a] probable blood clot in [her] pelvis." The standard of care

22

required Dr. Kuhn to suspect, recognize, and diagnose a bowel perforation by the third day after Sam's surgery and also required him to take Sam to surgery "to look for and treat the injury." Additionally, on the sixth day after surgery, when Sam's bowel perforation was actually diagnosed, the standard of care required Dr. Kuhn to recommend surgery to Sam and to immediately perform surgery to repair her bowel perforation. *See Baty*, 543 S.W.3d at 694 (courts must view report in its entirety, rather than isolating specific portions or sections, to determine whether it is sufficient); *Webb*, 228 S.W.3d at 282 ("The form of the report and the location of the information in the report are not dispositive.").

Dr. Paine's statements about the applicable standard of care for Dr. Kuhn are not vague or conclusory. Rather, the expert reports identify the specific actions that should have been taken by Dr. Kuhn but were not. *See Abshire*, 563 S.W.3d at 226–27; *see also Baty*, 543 S.W.3d at 695 (report not conclusory where it did not require one to infer what defendant physician should have done differently); *Keepers v. Blessett*, No. 01-18-01020-CV, 2019 WL 1523368, at *5 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, no pet.) (mem. op.) (expert report is adequate where it informs defendant physician of expert's opinion on what defendant should have done and what the defendant did instead). The stated standard of care need not be complicated for it to be sufficient. *See, e.g.*, *Baty*, 543 S.W.3d at 697; *see also Keepers*, 2019 WL 1523368, at *5–6 ("At times, the standard of care can be fairly basic." (internal

quotations omitted)). Dr. Paine clearly identifies the applicable standard of care related to Dr. Kuhn. The expert reports provide "enough information" for the trial court to have concluded that they constitute a good-faith effort to set forth the applicable standard of care related to Dr. Kuhn.[18] *See Miller*, 536 S.W.3d at 515–17; *see also New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 60, 64 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Mettauer*, 326 S.W.3d at 691 (not court's role to determine truth or falsity of expert's opinion, or truth or falsity of facts upon which expert bases such opinions, but only to act as gatekeeper in evaluating sufficiency of report itself).

We conclude that the trial court could have reasonably determined that Dr. Paine's expert reports represent an "objective good faith effort" to inform Dr. Kuhn of the specific conduct called into question, the standard of care that should have been followed, and what Dr. Kuhn should have done differently. Thus, we hold that the trial court did not err in overruling Dr. Kuhn's objections and denying Dr. Kuhn's

---

[18] To the extent Dr. Kuhn asserts that Dr. Paine has not accurately stated the standard of care, that complaint does not support a dismissal at this stage of the litigation. *See Aggarwal v. Trotta*, No. 01-19-00012-CV, 2019 WL 2426172, at *4 n.5 (Tex. App.—Houston [1st Dist.] June 11, 2019, no pet.) (mem. op.) ("To the extent [that the defendant physician] disputes that [the expert] has accurately stated the standard of care, his complaint does not support a Chapter 74 dismissal."); *Engh v. Reardon*, No. 01-09-00017-CV, 2010 WL 4484022, at *8 (Tex. App.—Houston [1st Dist.] Nov. 10, 2010, no pet.) (mem. op.) ("The [physicians] also challenge the accuracy of [the expert's] opinions with respect to [the] standard of care. Whether [the expert's] opinions regarding the applicable standard[] of care are correct, however, is an issue for summary judgment, not a motion to dismiss under Chapter 74.").

24

motion to dismiss Sam's health care liability claim against him on the ground that Dr. Paine's expert reports do not adequately address the standard of care as to Dr. Kuhn.

We overrule this portion of Dr. Kuhn's sole issue.

## B.     Causation Related to Dr. Kuhn

In the remaining portion of his sole issue, Dr. Kuhn argues that Dr. Paine's expert reports do not adequately address causation as it relates to him because the expert reports do not establish a causal link between Dr. Kuhn's conduct and Sam's injuries, the reports contain analytical gaps between Dr. Kuhn's alleged breach of the standard of care and Sam's alleged injury, and Dr. Paine's causation opinion is conclusory.

An expert report must provide a "fair summary" of the expert's opinion on the causal relationship between the failure of a defendant physician to provide care in accord with the applicable standard of care and the plaintiff's claimed injury, harm, or damages.  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Potts*, 392 S.W.3d at 630.  The expert report must explain how and why the defendant physician's breach of the standard of care proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017).  An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive

theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). But an expert cannot simply opine that the breach caused the injury. *Jelinek*, 328 S.W.3d at 539.

Causation consists of two components: (1) cause-in-fact and (2) foreseeability. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). A defendant physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach the harm would not have occurred. *Id.* Even if the harm would not have occurred absent the defendant physician's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (internal quotations omitted). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Id.* A defendant physician's breach is a foreseeable cause of the plaintiff's injury if physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala*, 564 S.W.3d at 197.

As to standard of care and breach of the standard of care, Dr. Paine, in his expert reports, states that bowel injuries, like a bowel perforation, are a well-known complication of a hysterectomy. On average they occur in one out of every 700

26

cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases. A bowel perforation should be diagnosed three days after a hysterectomy. Given the difficulties with Sam's hysterectomy and the extensive dissection that was required during her initial surgery, Dr. Kuhn, Sam's gynecologist, should have considered and suspected a bowel perforation by the third day after Sam's surgery, when Sam was experiencing pain, fever, nausea, and vomiting and a CT scan showed "a collection of fluid and [a] probable blood clot in [her] pelvis." The standard of care required Dr. Kuhn to suspect, recognize, and diagnose a bowel perforation by the third day after Sam's surgery and take Sam to surgery "to look for and treat the injury." Dr. Kuhn, by not doing either of those things, breached the standard of care.

Additionally, on the sixth day after her initial surgery, when Sam's bowel perforation was actually diagnosed, the standard of care required Dr. Kuhn to recommend surgery to Sam and to immediately perform surgery to repair the bowel perforation. But Dr. Kuhn did not do either of those things. Instead, he decided to "treat [Sam's] condition conservatively," by draining the fluid that was present. There is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) Dr. Kuhn's failure to take any action to repair Sam's bowel perforation, including his failure to consult with someone from general surgery to

27

explore Sam's abdomen and repair the bowel perforation, after the bowel perforation diagnosis on the sixth day following Sam's initial surgery was a breach of the standard of care. Further, Dr. Kuhn breached the standard of care by waiting until the tenth day after Sam's initial surgery to return Sam to surgery to repair the bowel perforation because it should have been repaired immediately upon its diagnosis.

As to causation, Dr. Paine, in his expert reports, states that because of the aforementioned breaches by Dr. Kuhn, Sam's condition worsened and endangered her life. Dr. Paine explained that a bowel perforation is a surgical emergency that requires immediate intervention. Immediate exploration, wash out of the peritoneal cavity, and repair of the bowel perforation is required. Any course of action other than immediate exploration, wash out, and repair, causes worsening peritonitis, sepsis, and possible death. According to Dr. Paine, Dr. Kuhn's failure to timely diagnose the bowel perforation, decision to pursue "conservative management" of Sam's bowel perforation after it was diagnosed on the sixth day after her initial surgery, failure to recommend surgical exploration and repair of the bowel perforation upon diagnosis, failure to not immediately repair the bowel perforation upon diagnosis, and decision to delay the repair of Sam's bowel perforation until the tenth day after her initial surgery, caused Sam's condition to deteriorate and allowed for the continued leakage of bowel contents into the peritoneal cavity. (Internal quotations omitted.) Without a repair of Sam's bowel perforation, bowel contents

28

continued to flow into Sam's peritoneal cavity "with all the bacteria, chemicals[,] and irritants [that] allow[] [an] infection to grow and worsen." The bowel leakage caused severe damage to Sam's physiology and permanent residual damage. And because the infection was allowed to grow, this led to a more complicated recovery process for Sam, a longer hospital stay, and long-term damage. Sam could not recover from the bowel perforation until it was actually repaired.

Further, during the surgery to repair Sam's bowel perforation, a diverting ileostomy had to be performed. According to Dr. Paine, the ileostomy was required because of a marked inflammatory reaction to bowel leakage for an extended length of time, i.e., four days after the bowel-perforation diagnosis and ten days after Sam's initial surgery. Had the bowel perforation been repaired at the time it was diagnosed, a colostomy would have been possible.

Dr. Paine also explains that peritonitis and sepsis, which are life-threatening conditions, can arise from a bowel perforation, and in such cases, they will not be resolved until the bowel perforation is repaired. Here, because of Dr. Kuhn's aforementioned breaches, Sam's peritonitis and sepsis grew worse—which is what happens when an infection is not properly treated and the source of the infection is not appropriately and timely addressed. Sam's condition worsened and endangered her life.

In determining whether an expert's causation opinion is conclusory, we must remain mindful that expert-report challenges are made at an early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the fact finder to determine liability. *Puppala*, 564 S.W.3d at 198. To provide more than a conclusory statement on causation, an expert report must include an "explanation tying the conclusion to the facts" and showing "how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *see also Puppala*, 564 S.W.3d at 197. The expert report need only provide some basis that the defendant physician's act or omission proximately caused injury. *Owens v. Handyside*, 478 S.W.3d 172, 187–88 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see also Palacios*, 46 S.W.3d at 879 (explaining "a plaintiff need not present evidence in the report as if it were actually litigating the merits. . . . [T]he information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial").

Here, Dr. Paine's causation opinion is in line with those found sufficient in other health-care-liability cases at this stage of the litigation where experts have opined that had the defendant physician not breached the standard of care, a proper diagnosis and medical intervention would have been achieved and the plaintiff's injury, harm, or damages would have been avoided. *See, e.g.*, *Whitmire v. Feathers*,

No. 01-19-00094-CV, 2020 WL 4983321, at \*15–16 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.) (mem. op.); *Puppala*, 564 S.W.3d at 198–202; *Owens*, 478 S.W.3d at 187–91. An expert may show causation by explaining a chain of events that begins with the defendant physician's negligence and ends in injury to the plaintiff. *See Whitmire*, 2020 WL 4983321, at \*16; *Owens*, 478 S.W.3d at 189; *McKellar v. Cervantes*, 367 S.W.3d 478, 485–86 (Tex. App.—Texarkana 2012, no pet.*); see also Christus Spohn Health Sys. Corp. v. Hinojosa*, No. 04-16-00288-CV, 2016 WL 7383819, at \*6 (Tex. App.—San Antonio Dec. 21, 2016, no pet.) (mem. op.) (expert report specified signs and symptoms that should have prompted defendant physician to admit patient to hospital for treatment; expert then opined that if patient had been admitted at least two things would have occurred). Here, Dr. Paine's expert reports explain the connection between Dr. Kuhn's alleged negligent conduct and the claimed injury, harm, or damages. *See THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 599, 614 (Tex. App.—El Paso 2016, no pet.) ("[T]he expert must at a minimum explain the connection between [the physician's] conduct and the injury to the patient."); *see also Whitmire*, 2020 WL 4983321, at \*16; *Owens*, 478 S.W.3d at 189 (expert may show causation by explaining chain of events that begins with defendant physician's negligence and ends in injury to plaintiff); *McKellar*, 367 S.W.3d at 485–86.

31

Finally, we note that Dr. Kuhn asserts that Dr. Paine's expert reports "do not address whether treating conservatively, by treating the symptoms of [the] infection without treating the source, might have reasonably ke[pt] . . . Sam's condition from worsening." But an expert report need not address all hypothetical scenarios. *See Whitmire*, 2020 WL 4983321, at *16; *VHS San Antonio Partners LLC v. Garcia*, No. 04-09-00297-CV, 2009 WL 3223178, at *6 (Tex. App.—San Antonio Oct. 7. 2009, pet. denied) (mem. op.). And although the law requires an expert report to link the expert's conclusion on causation with the alleged breach of the standard of care, nothing requires the expert report to address or rule out all other possible scenarios. *See Whitmire*, 2020 WL 4983321, at *16; *Garcia*, 2009 WL 3223178, at *6; *see also Owens*, 478 S.W.3d at 187 (report "need not anticipate or rebut all possible defensive theories that may ultimately be presented" in case). The correctness of Dr. Paine's opinion is not at issue in this stage of the litigation. *See Potts*, 392 S.W.3d at 632; *Whitmire*, 2020 WL 4983321, at *16.

We conclude that the trial court could have reasonably determined that Dr. Paine's expert reports represent an "objective good faith effort" to inform Dr. Kuhn of the causal relationship between Dr. Kuhn's purported failure to provide care in accord with the appliable standard of care and the claimed injury, harm, or damages. *See Zamarripa*, 526 S.W.3d at 460 (as long as report makes "a good-faith effort to explain, factually, how proximate cause is going to be proven," it satisfies TMLA's

threshold requirement); *Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (emphasizing expert reports "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support"). Thus, we hold that the trial court did not err in overruling Dr. Kuhn's objections and denying Dr. Kuhn's motion to dismiss Sam's health care liability claim against him on the ground that Dr. Paine's expert reports do not adequately address causation as to Dr. Kuhn.

We overrule the remaining portion of Dr. Kuhn's sole issue.[19]

## C. Vicarious Liability Related to Women's Healthcare

In its sole issue, Women's Healthcare argues that the trial court erred in overruling its objections to Dr. Paine's expert reports and denying its motion to dismiss Sam's vicarious liability health care liability claim against it because Dr. Paine's expert reports do not adequately address the standard of care and causation as it relates to Dr. Kuhn.

In her petition, Sam alleges that Women's Healthcare is vicariously liable for the conduct of Dr. Kuhn. Generally, when a plaintiff brings health care liability claims against more than one defendant physician or health care provider, the expert report must set forth the standard of care and breach of the standard of care as to

---

[19]   Due to our disposition, we need not address Dr. Kuhn's request for attorney's fees and costs. *See* TEX. R. APP. P. 47.1.

each defendant and explain the causal relationship between each defendant's individual acts or omissions and the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *Seton Family of Hosps. v. White*, 593 S.W.3d 787, 792 (Tex. App.—Austin 2019, pet. denied); *Pharmacy Healthcare Sols., Ltd. v. Pena*, 530 S.W.3d 169, 175 (Tex. App.—Eastland 2015, pet. denied). Yet, when a plaintiff brings a health care liability claim based on a vicarious liability theory against a defendant health care provider, an expert report that adequately implicates the actions of that party's agent or employee is sufficient as to the defendant health care provider. *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008); *Seton Family*, 593 S.W.3d at 792; *see also Owens*, 478 S.W.3d at 191 ("[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory." (alteration in original) (internal quotations omitted)). In other words, when a health care liability claim against a defendant health care provider is based on vicarious liability, an expert report that meets the statutory standards as to an agent or employee is sufficient to implicate the health care provider's conduct. *Potts*, 392 S.W.3d at 632; *Seton Family*, 593 S.W.3d at 792; *see also Owens*, 478 S.W.3d at 191–92 (expert report that is sufficient as to employee or agent, on whose

34

alleged negligent conduct vicarious liability claim was based, is also sufficient as to employer health care provider).

Having held that the trial court did not err in overruling Dr. Kuhn's objections to Dr. Paine's expert reports and denying Dr. Kuhn's motion to dismiss Sam's direct liability health care liability claim against him because Dr. Paine's expert reports meet the requirements of chapter 74 related to Dr. Kuhn, we hold that Sam may also proceed on the vicarious liability health care liability claim against Women's Healthcare which is based on the conduct of Dr. Kuhn. *See Potts*, 392 S.W.3d at 632; *Gardner*, 274 S.W.3d at 671–72; *Owens*, 478 S.W.3d at 191–92; *see also Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 295 (Tex. App.—Fort Worth 2008, pet. denied) ("[I]f the expert report is sufficient as to the claims against Dr. Ward, and we have held that it is[,] . . . then the report is sufficient as to [the] claims against CND that are based on Dr. Ward's alleged negligence.").

We overrule Women's Healthcare's sole issue.

## Dr. James and Metropolitan Houston

In his sole issue, Dr. James argues that the trial court erred in overruling his objections to Dr. Paine's expert reports and denying his motion to dismiss Sam's health care liability claim against him because Dr. Paine is not qualified to offer an opinion on the standard of care and causation related to Dr. James and Dr. Paine's expert reports do not adequately address causation as it relates to Dr. James. In its

35

sole issue, Metropolitan Houston argues that the trial court erred in overruling its objections to Dr. Paine's expert reports and denying its motion to dismiss Sam's vicarious liability health care liability claim against it because Dr. Paine is not qualified to offer an opinion on the standard of care and causation related to Dr. James and Dr. Paine's expert reports do not adequately address causation as it relates to Dr. James.

## A.      Dr. Paine's Qualifications Related to Standard of Care

In a portion of his sole issue, Dr. James argues that Dr. Paine is not qualified to offer an opinion on the standard of care related to Dr. James because Dr. Paine's expert reports and CV do not "reflect that he is qualified . . . to opine on the standard of care for a consulting surgeon such as Dr. James with respect to surgical post-operative management of a patient who has undergone a hysterectomy with a bowel perforation." Dr. James further asserts that his practice area is general surgery, while Dr. Paine's practice area is obstetrics and gynecology, and "the fact that Dr. Paine is familiar with post-operative care for hysterectomy patients does not mean that he is knowledgeable about the standard of care applicable to a general surgeon . . . who is consulted in the circumstances presented in this case."

An expert report by a person not qualified to testify does not constitute a good-faith effort to comply with the TMLA's definition of an expert report and warrants dismissal. *See Mettauer*, 326 S.W.3d at 693; *Hendrick Med. Ctr. v.*

36

*Conger*, 298 S.W.3d 784, 789 (Tex. App.—Eastland 2009, no pet.) (where expert not qualified to offer opinion, expert report is rendered deficient); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6). Whether an expert witness is qualified to offer an expert opinion lies within the sound discretion of the trial court. *Cornejo*, 446 S.W.3d at 121. The expert's qualifications must appear in the four corners of the expert report or in the expert's accompanying CV. *Puppala*, 564 S.W.3d at 197, 202; *see also Cornejo*, 446 S.W.3d at 121.

In a suit involving a health care liability claim against a physician, a person is qualified as an expert on the issue of whether the physician departed from the accepted standard of care, if the expert is a physician who:

1. is practicing medicine[20] at the time such testimony is given or was practicing medicine at the time the claim arose;

2. has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

3. is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

---

[20] "[P]racticing medicine . . . includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provided direct patient care, upon the request of such other physicians." TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(b) (internal quotations omitted).

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a); *see also id.* § 74.351(r)(5)(A) ("[e]xpert" means "with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of [s]ection 74.401" (internal quotations omitted); *Methodist Hosp. v. Addison*, 574 S.W.3d 490, 503 (Tex. App.—Houston [14th Dist.] 2018, no pet.). In determining whether a witness is "qualified on the basis of training or experience" to offer an expert opinion about the applicable standard of medical care,

> the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c).

A physician serving as an expert need not be a specialist in the particular area of the profession for which his testimony is offered. *See Owens*, 478 S.W.3d at 185; *Rittger v. Danos*, 332 S.W.3d 550, 558–59 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also Bailey v. Amaya Clinic Inc.*, 402 S.W.3d 359, 363–64 (Tex. App.— Houston [14th Dist.] 2013, no pet.) (orthopedic surgeon qualified to opine about standard of care applicable to dermatologist who was treating plaintiff for weight loss with liposuction); *Blan v. Ali*, 7 S.W.3d 741, 745–46 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Despite the fact that we live in a world of niche medical

38

practices and multilayer specializations, there are certain standards of medical care that apply to multiple schools of practice and any medical [physician]. To categorically disqualify a physician from testifying as to the standard of care solely because he is from a different school of practice than the [physicians] charged with malpractice ignores the criteria set out in [TMLA] and [Texas] Rule [of Evidence] 702."). The plain language of the TMLA does not focus on the physician's area of expertise, but on the particular condition or circumstances involved in the plaintiff's claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(2); *Rittger*, 332 S.W.3d at 558; *see also Lee v. Le*, No. 01-18-00309-CV, 2018 WL 4923938, at *4 (Tex. App.—Houston [1st Dist.] Oct. 11, 2018, no pet.) (mem. op.) ("[T]he applicable standard of care and an expert's ability to opine on it are dictated by the medical condition involved in the claim and the expert's familiarity and experience with that condition." (internal quotations omitted)). The critical inquiry is whether the expert's expertise goes to the very matter on which he is to give an opinion. *See Broders*, 924 S.W.2d at 152–53; *Mangin*, 480 S.W.3d at 707. It is Sam's burden to show that Dr. Paine is qualified to opine on the applicable standard of care as to Dr. James. *See Rittger*, 332 S.W.3d at 558–59; *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757, 762 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Dr. Paine's expert reports and CV show that he is a licensed physician and is board certified in obstetrics and gynecology. He has been practicing medicine in the

field of obstetrics and gynecology for thirty-five years. Currently, he is a member of the teaching faculty as an associate professor in the department of obstetrics and gynecology at the University of Texas Health Science Center in San Antonio. In his position as an associate professor, he trains residents and students in obstetrics and gynecology. He is actively practicing medicine in the field of obstetrics and gynecology, and he was practicing medicine at the time Sam's claims arose. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401.

Dr. Paine has extensive experience in the field of obstetrics and gynecology, and he has performed thousands of hysterectomies during his career. He has knowledge of the accepted standards of medical and surgical care required for patients needing hysterectomies. This includes knowledge of the standards of pre-operative, inter-operative, and post-operative care required for patients who have hysterectomies.

When Dr. Paine treats patients requiring hysterectomies, he provides pre-operative, inter-operative, and post-operative care to his patients. Post-operative care includes "following [a] patient after [a] surgery is complete[] to diagnose and treat any complications that may arise from the surgical procedure." This case involves the purported failure of appellants, including Dr. James, to appropriately care for and treat Sam after a hysterectomy, and Dr. Paine is familiar with the type of post-operative care a patient, such as Sam, should receive and how post-operative

40

complications, like those experienced by Sam, should be managed and treated. *See Broders*, 924 S.W.2d at 152–53 (focus is on "whether the expert's expertise goes to the very matter on which he . . . is to give an opinion"); *Baylor Univ. Med. Ctr. v. Biggs*, 237 S.W.3d 909, 916 (Tex. App.—Dallas 2007, pet. denied) ("[T]he focus is on the fit between the subject matter at issue and the expert's familiarity with it, not on a comparison of the expert's title or specialty with that of the defendant . . . ." (internal quotations omitted)); *see also Owens*, 478 S.W.3d at 186–87 (specific issue in case was whether defendant physicians failed to timely and appropriately diagnose and treat plaintiff's condition and expert report showed that expert had experience treating patients with condition suffered by plaintiff and he was familiar with the standard of care applicable to physicians who care for patients with same condition with which plaintiff presented).

We note that as to the standard of care and breach of the of the standard of care for Dr. James, Dr. Paine, in his expert reports, states that bowel injuries, like a bowel perforation, are a well-known complication of a hysterectomy. On average they occur in one out of every 700 cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases. A bowel perforation should be diagnosed three days after a hysterectomy.

According to Dr. Paine, Dr. James was the general surgeon "following . . . Sam[] post-hysterectomy." Because Dr. James was the general surgeon "following" Sam after her surgery, once Sam's bowel perforation was diagnosed on the sixth day after her surgery, the standard of care required Dr. James to act upon the diagnosis by surgically repairing the bowel perforation immediately or at least recommending surgical repair of the bowel perforation. But Dr. James did not do so, and instead joined in the "conservative" treatment plan with Dr. Kuhn. (Internal quotations omitted.) There is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) By failing to recommend surgical repair of Sam's bowel perforation and by failing to surgically repair the bowel perforation immediately, Dr. James breached the standard of care. Further, Dr. James breached the standard of care by waiting until the tenth day after Sam's initial surgery to return Sam to surgery to repair the bowel perforation because it should have been repaired immediately upon its diagnosis.

Here, we conclude that Sam has met her burden of establishing that Dr. Paine is qualified to offer an opinion on the standard of care related to Dr. James. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a) (expert meets requirements of Texas Civil Practice and Remedies Code [section] 74.401 if he (1) is practicing medicine, (2) has knowledge of accepted standard of care for diagnosis, care, or treatment of

42

illness, injury, or condition involved in claim, and (3) is qualified on basis of training or experience to offer expert opinion about accepted standard of care); *Lee*, 2018 WL 4923938, at *4 ("[T]he applicable standard of care and an expert's ability to opine on it are dictated by the medical condition involved in the claim and the expert's familiarity and experience with that condition." (internal quotations omitted)). The Texas Supreme Court has cautioned reviewing courts from drawing expert qualifications too narrowly, as Dr. James has requested us to do in this case, and we reemphasize that a proffered expert need not practice in the same specialty as the defendant physician to qualify as an expert in the case. *See Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006); *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003); *see also Owens*, 478 S.W.2d at 186; *Blan*, 7 S.W.3d at 745 (general surgeon qualified to testify about standard of care for post-operative procedures performed by gynecologist because post-operative procedures are common to both fields).

We hold that the trial court did not err in overruling Dr. James's objections and denying Dr. James's motion to dismiss Sam's health care liability claim against him on the ground that Dr. Paine is not qualified to offer an opinion on the standard of care related to Dr. James.

We overrule this portion of Dr. James's sole issue.

**B.      Dr. Paine's Qualifications Related to Causation**

In another portion of his sole issue, Dr. James argues that Dr. Paine is not qualified to offer an opinion on causation related to Dr. James because Dr. Paine's expert reports and CV do not show that Dr. Paine has "experience in handling patients with peritonitis and sepsis secondary to a bowel perforation" or that he has the qualifications "to opine on the cause of [Sam's] alleged damages" and the ramifications of the "alleged four[-]day delay in [the] surgical repair of [Sam's] bowel perforation."

To be qualified to opine on the causal relationship between a defendant physician's alleged failure to meet an applicable standard of care and the plaintiff's claimed injury, harm, or damages, the author of an expert report must be a physician who is qualified to render opinions on such causal relationships under the Texas Rules of Evidence.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *see id.* § 74.351(r)(5)(C) ("[e]xpert" means "with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence" (internal quotations omitted)); *Cornejo*, 446 S.W.3d at 120.

44

An expert witness may be qualified on the basis of knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would "assist the trier of fact" in understanding the evidence or determining a fact issue. *Cornejo*, 446 S.W.3d at 121 (internal quotations omitted); *see* TEX. R. EVID. 702. Thus, a plaintiff must show that her expert has "knowledge, skill, experience, training, or education" about the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153–54 (internal quotations omitted); *see also Cornejo*, 446 S.W.3d at 121.

Not every licensed physician is qualified to testify on every medical question. *See Broders*, 942 S.W.2d at 152–53; *Cornejo*, 446 S.W.3d at 121. Yet, a physician need not practice in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education about the specific issue before the court that would qualify him to give an opinion on that subject. *Cornejo*, 446 S.W.3d at 121. Simply put, what is required is that the physician demonstrate that he is qualified to opine on the specific issue before the court. *Puppala*, 564 S.W.3d at 202.

Here it is asserted that Dr. James was the general surgeon "following . . . Sam[] post-hysterectomy." Because Dr. James was the general surgeon "following" Sam after her surgery, once Sam's bowel perforation was

45

diagnosed on the sixth day after her surgery, Dr. James should have acted upon the diagnosis by surgically repairing the bowel perforation immediately or at least recommending surgical repair of the bowel perforation. Instead, Dr. James joined in the "conservative" treatment plan with Dr. Kuhn, although there is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) By failing to recommend surgical repair of Sam's bowel perforation and by failing to surgically repair the bowel perforation immediately, Dr. James breached the standard of care. Dr. James also breached the standard of care by waiting until the tenth day after Sam's initial surgery to return Sam to surgery to repair the bowel perforation because it should have been repaired immediately upon its diagnosis.

It is also asserted that Dr. James's breaches of the standard of care caused Sam's condition to worsen and endangered her life. A bowel perforation is a surgical emergency that requires immediate intervention. Immediate exploration, wash out of the peritoneal cavity, and repair of the bowel perforation is required. Any course of action other than immediate exploration, wash out, and repair, causes worsening peritonitis, sepsis, and possible death. Dr. James's failure to recommend surgical exploration and repair of Sam's bowel perforation upon its diagnosis, to not immediately repair the bowel perforation upon its diagnosis, and to not repair Sam's bowel perforation until the tenth day after her initial surgery caused Sam's condition

46

to deteriorate and allowed for the continued leakage of bowel contents into the peritoneal cavity. Without a repair of Sam's bowel perforation, bowel contents continued to flow into Sam's peritoneal cavity "with all the bacteria, chemicals[,] and irritants [that] allow[] [an] infection to grow and worsen." The bowel leakage caused severe damage to Sam's physiology and permanent residual damage, and it allowed for Sam's peritonitis and sepsis to grow worse. And because Sam's infection was allowed to grow, this led to a more complicated recovery process for Sam, a longer hospital stay, and long-term damage. Sam could not recover from the bowel perforation until it was actually repaired.

Further, during the surgery to repair Sam's bowel perforation, a diverting ileostomy had to be performed. The ileostomy was required because of a marked inflammatory reaction to bowel leakage for an extended length of time, i.e., four days after the bowel-perforation diagnosis and ten days after Sam's initial surgery. Had the bowel perforation been repaired at the time it was diagnosed, a colostomy would have been possible.

Sam has the burden of establishing that Dr. Paine has "knowledge, skill, experience, training, or education" about whether Dr. James's breaches of the standard of care—by failing to recommend surgical exploration and repair of Sam's bowel perforation upon its diagnosis, not immediately repairing the bowel perforation upon its diagnosis, and not repairing Sam's bowel perforation until the

47

tenth day after Sam's initial surgery—caused Sam's claimed injury, harm, or damages. *See Matagorda v. Nursing & Rehab. Ctr., L.L.C. v. Brooks*, No. 13-16-00266-CV, 2017 WL 127867, at \*6 (Tex. App.—Corpus Christi–Edinburg Jan. 12, 2017, no pet.) (mem. op.) (internal quotations omitted); *Diagnostic Research Grp. v. Vora*, 473 S.W.3d 861, 869–70 (Tex. App.—San Antonio 2015, no pet.); *see also Cornejo*, 446 S.W.3d at 121 (plaintiffs required to establish expert qualified on basis of knowledge, skill, experience, training, or education to offer opinion concerning causal link between alleged breaches of standard of care and injuries suffered); *Burrell*, 230 S.W.3d at 757, 762 (party offering witness as expert must establish witness is qualified).

In his expert reports, Dr. Paine states that he is a licensed physician and is board certified in obstetrics and gynecology. He has been practicing in the field of obstetrics and gynecology for thirty-five years. Currently, he is a member of the teaching faculty as an associate professor in the department of obstetrics and gynecology at the University of Texas Health Science Center in San Antonio. In his position as an associate professor, he trains residents and students in obstetrics and gynecology.

Dr. Paine is actively practicing medicine in the field of obstetrics and gynecology, and he was practicing medicine at the time Sam's claims arose. Dr. Paine has extensive experience in the field of obstetrics and gynecology, and he, as

48

part of his medical practice, has performed thousands of hysterectomies during his career. He has knowledge of the accepted standards of medical and surgical care required for patients needing hysterectomies. This includes knowledge of the standards of pre-operative, inter-operative, and post-operative care required for patients who have hysterectomies.

When Dr. Paine treats patients requiring hysterectomies, he provides pre-operative, inter-operative, and post-operative care to his patients. Post-operative care includes "following [a] patient after [a] surgery is complete[] to diagnose and treat any complications that may arise from the surgical procedure." This case involves the purported failure of appellants, including Dr. James, to appropriately care for and treat Sam after a hysterectomy, and Dr. Paine is familiar with the type of post-operative care a patient, such as Sam, should receive and how post-operative complications, like those experienced by Sam, should be managed and treated.

We conclude that Dr. Paine's expert reports and CV demonstrate that he is qualified to offer an opinion on the causal link between Dr. James's alleged breaches while providing post-operative care after Sam's hysterectomy and Sam's injuries, harm, and damages. *See Jassin v. Bennett*, No. 10-12-00053-CV, 2012 WL 5974020, at *5 (Tex. App.—Waco Nov. 29, 2012, no pet.) (mem. op.) ("We cannot say that the trial court abused its discretion in . . . finding that Dr. Branch is qualified to provide an expert report on causation for the complications that allegedly arose

49

from Dr. Jassin's post-operative care following a sinus surgery that Dr. Branch says he has performed approximately 200 times, along with providing the follow-up care for those surgeries."); *Sloman-Moll v. Chavez*, No. 04-06-00589-CV, 2007 WL 595134, at *3–4 (Tex. App.—San Antonio Feb. 28, 2007, pet. denied) (mem. op.) ("It is axiomatic that a physician trained to perform a surgery is also trained to manage surgical complications."); *Keo v. Vu*, 76 S.W.3d 725, 733 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding physician who regularly performed surgery on head and neck was qualified to give opinion about issues common to all surgeries, including treatment of post-operative infections); *see also Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 630 (Tex. App.—Fort Worth 2012, pet. denied) ("[A] physician needs only to show how he is qualified to opine on the cause of the plaintiff's injury.").

Further, because we have concluded that that the trial court properly determined that Dr. Paine is qualified to offer an opinion on the standard of care as to Dr. James, it would have been reasonable for the trial court to also conclude that Dr. Paine is qualified to offer an opinion on Dr. James's failure to meet the standard of care and the resulting harm. *See Healy v. Mowat-Cudd*, No. 04-20-00479-CV, 2021 WL 603369, at *2 n.1 (Tex. App.—San Antonio Feb. 17, 2021, no pet.) (mem. op.); *Legend Oaks-S. San Antonio, LLC v. Molina ex rel. Estates of Rocamontes*, No. 04-14-00289-CV, 2015 WL 693225, at *5 (Tex. App.—San Antonio Feb. 18, 2015,

50

no pet.) (mem. op.); *Jassin*, 2012 WL 5974020, at \*5; *Hillcrest Baptist Med. Ctr. v. Payne*, No. 10-11-00191-CV, 2011 WL 5830469, at \*7 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem. op.); *Whisenant v. Arnett*, 339 S.W.3d 920, 927–28 (Tex. App.—Dallas 2011, no pet.).

We hold that the trial court did not err in overruling Dr. James's objections and denying Dr. James's motion to dismiss Sam's health care liability claim against him on the ground that Dr. Paine is not qualified to offer an opinion on causation related to Dr. James.

We overrule this portion of Dr. James's sole issue.

## C.     Causation Related to Dr. James

In the remaining portion of his sole issue, Dr. James argues that Dr. Paine's expert reports do not adequately address causation as it relates to him because the expert reports do not establish a causal link between Dr. James's conduct and Sam's injuries, Dr. Paine's causation opinion is conclusory and speculative, and "Dr. Paine fails to establish that 'but for' Dr. James'[s] alleged negligence, Sam's outcome would have been any different."

An expert report must provide a "fair summary" of the expert's opinion about the causal relationship between the failure of a defendant physician to provide care in accord with the applicable standard of care and the plaintiff's claimed injury, harm, or damages.  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also*

51

*Potts*, 392 S.W.3d at 630. The expert report must explain how and why the defendant physician's breach of the standard of care proximately caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 459–60. An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Cornejo*, 446 S.W.3d at 123. But an expert cannot simply opine that the breach caused the injury. *Jelinek*, 328 S.W.3d at 539.

Causation consists of two components: (1) cause-in-fact and (2) foreseeability. *McCoy*, 554 S.W.3d at 658. A defendant physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach the harm would not have occurred. *Id.* Even if the harm would not have occurred absent the defendant physician's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a substantial factor. *Allways Auto Grp.*, 530 S.W.3d at 149 (internal quotations omitted). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Id.* A defendant physician's breach is a foreseeable cause of the plaintiff's injury if a physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala*, 564 S.W.3d at 197.

As to standard of care and breach of the standard of care related to Dr. James, Dr. Paine, in his expert reports, states that bowel injuries, like a bowel perforation, are a well-known complication of a hysterectomy. On average they occur in one out of every 700 cases. But if a hysterectomy is performed when adhesions are present and when an extensive bowel dissection is also required, the rate of bowel injuries increases.

Because Dr. James was the general surgeon "following . . . Sam[] post-hysterectomy," once Sam's bowel perforation was diagnosed on the sixth day after surgery, the standard of care required Dr. James to act upon the diagnosis by surgically repairing the bowel perforation immediately or at least recommending surgical repair of the bowel perforation. But James did not do so. Instead, he joined in the "conservative" treatment plan with Dr. Kuhn. (Internal quotations omitted.) There is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) By failing to recommend surgical repair of Sam's bowel perforation and failing to surgically repair the bowel perforation immediately after its diagnosis, Dr. James breached the standard of care. Dr. James also breached the standard of care by waiting until the tenth day after Sam's initial surgery to return Sam to surgery to repair the bowel perforation because it should have been repaired immediately upon its diagnosis.

As to causation, Dr. Paine, in his expert reports, states that because of the aforementioned breaches of the standard of care by Dr. James, Sam's condition worsened and endangered her life. Dr. Paine explained that a bowel perforation is a surgical emergency that requires immediate intervention. Immediate exploration, wash out of the peritoneal cavity, and repair of the bowel perforation is required. Any course of action other than immediate exploration, wash out, and repair, causes worsening peritonitis, sepsis, and possible death. According to Dr. Paine, Dr. James's failure to recommend surgical exploration and repair of Sam's bowel perforation upon its diagnosis, to not surgically repair the bowel perforation immediately upon its diagnosis, and to not repair Sam's bowel perforation until the tenth day after her initial surgery caused Sam's condition to deteriorate and allowed for the continued leakage of bowel contents into the peritoneal cavity. Without a repair of Sam's bowel perforation, bowel contents continued to flow into Sam's peritoneal cavity "with all the bacteria, chemicals[,] and irritants [that] allow[] [an] infection to grow and worsen." The bowel leakage caused severe damage to Sam's physiology and permanent residual damage. And because the infection was allowed to grow, this led to a more complicated recovery process for Sam, a longer hospital stay, and long-term damage. Sam could not recover from the bowel perforation until it was actually repaired.

Further, during the surgery to repair Sam's bowel perforation, a diverting ileostomy had to be performed. According to Dr. Paine, the ileostomy was required because of a marked inflammatory reaction to bowel leakage for an extended length of time, i.e., four days after the bowel-perforation diagnosis and ten days after Sam's initial surgery. Had the bowel perforation been repaired at the time it was diagnosed, a colostomy would have been possible.

Dr. Paine also explains that peritonitis and sepsis, which are life-threatening conditions, can arise from a bowel perforation, and in such cases, they will not be resolved until the bowel perforation is repaired. Here, because of Dr. James's breaches of the standard of care, Sam's peritonitis and sepsis grew worse—which is what happens when an infection is not properly treated and the source of the infection is not appropriately and timely addressed. Sam's condition worsened and endangered her life.

In determining whether an expert's causation opinion is conclusory, we must remain mindful that expert-report challenges are made at an early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the fact finder to determine liability. *Puppala*, 564 S.W.3d at 198. To provide more than a conclusory statement on causation, an expert report must simply include an "explanation tying the conclusion to the facts" and showing "how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d

55

at 539–40; *see also Puppala*, 564 S.W.3d at 197. The expert report need only provide some basis that the defendant physician's act or omission proximately caused injury. *Owens*, 478 S.W.3d at 187–88; *see also Palacios*, 46 S.W.3d at 879 (explaining "a plaintiff need not present evidence in the report as if it were actually litigating the merits. . . . [T]he information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial").

Here, Dr. Paine's causation opinion is in line with those found sufficient in other health-care-liability cases at this stage of the litigation where experts have opined that had the defendant physician not breached the standard of care, a proper diagnosis and medical intervention would have been achieved and the plaintiff's injury, harm, or damages would have been avoided. *See, e.g.*, *Whitmire*, 2020 WL 4983321, at *15–16; *Puppala*, 564 S.W.3d at 198–202; *Owens*, 478 S.W.3d at 187–91. An expert may show causation by explaining a chain of events that begins with the defendant physician's negligence and ends in injury to the plaintiff. *See Whitmire*, 2020 WL 4983321, at *16; *Owens*, 478 S.W.3d at 189; *McKellar*, 367 S.W.3d at 485–86; *see also Hinojosa*, 2016 WL 7383819, at *6 (expert report specified signs and symptoms that should have prompted defendant physician to admit patient to hospital for treatment; expert then opined that if patient had been admitted at least two things would have occurred). Dr. Paine's expert reports explain

the connection between Dr. James's alleged negligent conduct and the claimed injury, harm, or damages. *See Tiscareno*, 495 S.W.3d at 614 ("[T]he expert must at a minimum explain the connection between [the physician's] conduct and the injury to the patient."); *see also Whitmire*, 2020 WL 4983321, at *16; *Owens*, 478 S.W.3d at 189 (expert may show causation by explaining chain of events that begins with defendant physician's negligence and ends in injury to plaintiff); *McKellar*, 367 S.W.3d at 485–86.

Finally, we note that Dr. James asserts that Dr. Paine's expert reports do not establish that without Dr. James's purported negligence "Sam's outcome would have been any different." But an expert report need not address all hypothetical scenarios. *See Whitmire*, 2020 WL 4983321, at *16; *Garcia*, 2009 WL 3223178, at *6. And although the law requires an expert report to link the expert's conclusion on causation with the alleged breach of the standard of care, nothing requires the expert report to address or rule out all other possible scenarios. *See Whitmire*, 2020 WL 4983321, at *16; *Garcia*, 2009 WL 3223178, at *6; *see also Owens*, 478 S.W.3d at 187 (report "need not anticipate or rebut all possible defensive theories that may ultimately be presented" in case). The correctness of Dr. Paine's opinion is not at issue in this stage of the litigation. *See Potts*, 392 S.W.3d at 632; *Whitmire*, 2020 WL 4983321, at *16.

We conclude that the trial court could have reasonably determined that Dr. Paine's expert reports represent an "objective good faith effort" to inform Dr. James of the causal relationship between Dr. James's purported failure to provide care in accord with the appliable standard of care and the claimed injury, harm, or damages. *See Zamarripa*, 526 S.W.3d at 460 (as long as report makes "a good-faith effort to explain, factually, how proximate cause is going to be proven," it satisfies TMLA's threshold requirement); *Kelly*, 255 S.W.3d at 679 (emphasizing expert reports "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support"). Thus, we hold that the trial court did not err in overruling Dr. James's objections and denying Dr. James's motion to dismiss Sam's health care liability claim against him on the ground that Dr. Paine's expert reports do not adequately address causation as to Dr. James.

We overrule the remaining portion of Dr. James's sole issue.[21]

## D. Vicarious Liability Related to Metropolitan Houston

In its sole issue, Metropolitan Houston argues that the trial court erred in overruling its objections to Dr. Paine's expert reports and denying its motion to dismiss Sam's vicarious liability health care liability claim against it because Dr. Paine is not qualified to offer an opinion on the standard of care and causation related

---

[21] Due to our disposition, we need not address Dr. James's request for attorney's fees and costs. *See* TEX. R. APP. P. 47.1.

to Dr. James and Dr. Paine's expert reports do not adequately address causation as it relates to Dr. James.

In her petition, Sam alleges that Metropolitan Houston is vicariously liable for the conduct of Dr. James. Generally, when a plaintiff brings health care liability claims against more than one defendant physician or health care provider, the expert report must set forth the standard of care and breach of the standard of care as to each defendant and explain the causal relationship between each defendant's individual acts or omissions and the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *Seton Family*, 593 S.W.3d at 792; *Pena*, 530 S.W.3d at 175. Yet, when a plaintiff brings a health care liability claim based on a vicarious liability theory against a defendant health care provider, an expert report that adequately implicates the actions of that party's agent or employee is sufficient as to the defendant health care provider. *Gardner*, 274 S.W.3d at 671–72; *Seton Family*, 593 S.W.3d at 792; *see also Owens*, 478 S.W.3d at 191 ("[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory." (alteration in original) (internal quotations omitted)). In other words, when a health care liability claim against a defendant health care provider is based on vicarious liability, an expert report that meets the statutory standards as to

59

an agent or employee is sufficient to implicate the health care provider's conduct. *Potts*, 392 S.W.3d at 632; *Seton Family*, 593 S.W.3d at 792; *see also Owens*, 478 S.W.3d at 191–92 (expert report that is sufficient as to employee or agent, whose alleged negligent conduct vicarious liability claim was based, is also sufficient as to employer health care provider).

Having held that the trial court did not err in overruling Dr. James's objections to Dr. Paine's expert reports and denying Dr. James's motion to dismiss Sam's direct liability health care liability claim against him because Dr. Paine's expert reports meet the requirements of chapter 74 related to Dr. James, we hold that Sam may also proceed on the vicarious liability health care liability claim against Metropolitan Houston which is based on the conduct of Dr. James. *See Potts*, 392 S.W.3d at 632; *Gardner*, 274 S.W.3d at 671–72; *Owens*, 478 S.W.3d at 191–92; *see also George*, 261 S.W.3d at 295 ("[I]f the expert report is sufficient as to the claims against Dr. Ward, and we have held that it is[,] . . . then the report is sufficient as to [the] claims against CND that are based on Dr. Ward's alleged negligence.").

We overrule Metropolitan Houston's sole issue.[22]

---

[22] Due to our disposition, we need not address Metropolitan Houston's request for attorney's fees and costs. *See* TEX. R. APP. P. 47.1.

60

**Dr. Morales, West Houston Radiology, and Radiology Partners**

In his sole issue, Dr. Morales argues that the trial court erred in overruling his objections to Dr. Paine's expert reports and denying his motion to dismiss Sam's health care liability claim against him because Dr. Paine is not qualified to offer an opinion on the standard of care and causation related to Dr. Morales and Dr. Paine's expert reports do not adequately address causation as it relates to Dr. Morales. In their sole issues, West Houston Radiology and Radiology Partners argue that the trial court erred in overruling their objections to Dr. Paine's expert reports and denying their motions to dismiss Sam's vicarious liability health care liability claim against them because Dr. Paine is not qualified to offer an opinion on the standard of care and causation related to Dr. Morales and Dr. Paine's expert reports do not adequately address causation as it relates to Dr. Morales.

**A. Preservation**

In portions of their sole issues, Dr. Morales, West Houston Radiology, and Radiology Partners argue that the trial court erred in overruling their objections to Dr. Paine's expert reports and in denying their motions to dismiss Sam's health care liability claims against them because Dr. Paine is not qualified to offer an opinion on the standard of care related to Dr. Morales and Dr. Paine's expert reports do not adequately address causation as it relates to Dr. Morales.

To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion and the trial court either ruled on the party's request, objection, or motion, or refused to rule, and the party objected to that refusal. TEX. R. APP. P. 33.1(a). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991); *see also Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 21 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("Rule 33.1 requires the appealing party to adequately raise issues before the trial court to give the trial court notice of [the party's] complaint.").

Texas Civil Practice and Remedies Code section 74.351(a) states, in pertinent part, that a defendant physician or health care provider "whose conduct is implicated in a[n] [expert] report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed" and the failure to do so waives the defendant's objections. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). In the trial court, Dr. Morales, West Houston Radiology, and Radiology Partners timely objected to Dr. Paine's expert reports and requested that Sam's health care liability claims against them be dismissed. In doing so, they only objected that Dr. Paine is not qualified to offer an opinion on causation related to Dr. Morales. Dr. Morales, West Houston Radiology, and Radiology Partners did not assert in their objections

62

and motions to dismiss that Dr. Paine is not qualified to offer an opinion on the standard of care related to Dr. Morales or that Dr. Paine's expert reports do not adequately address causation as it relates to Dr. Morales.

Because Dr. Morales, West Houston Radiology, and Radiology Partners did not raise in the trial court their complaints that Dr. Paine is not qualified to offer an opinion on the standard of care and that Dr. Paine's expert reports do not adequately address causation, we hold that they have not preserved those complaints for our review. *See id.*; TEX. R. APP. P. 33.1(a); *Armenta v. Jones*, No. 01-17-00439-CV, 2018 WL 1095388, at *2, *7 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (where defendant physician did not object to expert report "on the basis of inadequacy of the report as to causation," defendant's complaint about causation waived because it was not raised in trial court); *Arnett*, 339 S.W.3d at 925–26 (defendant physician's complaint that expert report did not sufficiently address causation because it did not rule out potential causes of wound infection and pain not preserved when it was raised for first time on appeal); *Williams v. Mora*, 264 S.W.3d 888, 890–91 (Tex. App.—Waco 2008, no pet.) (defendant physician's only timely objection to expert report was that two statements were speculative; all other complaints about expert report that were not raised in trial court were waived, including complaints raised for the first time on appeal). We address the remaining

portions of the issues raised by Dr. Morales, West Houston Radiology, and Radiology Partners that are preserved for our review.

## B.    Dr. Paine's Qualifications to Opine on Causation

In the remaining portion of his sole issue, Dr. Morales argues that Dr. Paine is not qualified to offer an opinion on causation related to Dr. Morales because Dr. Paine "does not address his experience in caring for patients with peritonitis and sepsis secondary to a bowel perforation" and Dr. Paine's expert reports and CV "do not reflect qualifications allowing him to opine on the cause of [Sam's] alleged damages" or the ramifications of the "alleged four[-]day delay in [the] surgical repair of [Sam's] bowel perforation."

To be qualified to opine on the causal relationship between a defendant physician's alleged failure to meet an applicable standard of care and the plaintiff's claimed injury, harm, or damages, the author of an expert report must be a physician who is qualified to render opinions on such causal relationships under the Texas Rules of Evidence.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *see id.* § 74.351(r)(5)(C) ("[e]xpert" means "with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on

64

such causal relationship under the Texas Rules of Evidence" (internal quotations omitted)); *Cornejo*, 446 S.W.3d at 120.

An expert witness may be qualified on the basis of knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would "assist the trier of fact" in understanding the evidence or determining a fact issue. *Cornejo*, 446 S.W.3d at 121 (internal quotations omitted); *see* TEX. R. EVID. 702. Thus, a plaintiff must show that her expert has "knowledge, skill, experience, training, or education" about the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153–54 (internal quotations omitted); *see also Cornejo*, 446 S.W.3d at 121.

Not every licensed physician is qualified to testify on every medical question. *See Broders*, 942 S.W.2d at 152–53; *Cornejo*, 446 S.W.3d at 121. Yet, a physician need not practice in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education about the specific issue before the court that would qualify him to give an opinion on that subject. *Cornejo*, 446 S.W.3d at 121. Simply put, what is required is that the physician demonstrate that he is qualified to opine on the specific issue before the court. *Puppala*, 564 S.W.3d at 202.

Here, it is asserted that Dr. Morales "drain[ed] the peritoneal cavity" after Sam was diagnosed with a bowel perforation on the sixth day after her initial surgery. Yet, there is no precedent for "conservative management" of a bowel perforation when there is evidence of bowel contents and gas free in the peritoneal cavity. (Internal quotations omitted.) Based on Sam's diagnosis of a bowel perforation on the sixth day after her surgery, Dr. Morales should have recommended immediate surgical exploration and repair of the bowel perforation. Dr. Morales did not do this, and thus, breached the standard of care.

It is also asserted that Dr. Morales's breach of the standard of care caused Sam's condition to worsen and endangered her life. A bowel perforation is a surgical emergency that requires immediate intervention. Immediate exploration, wash out of the peritoneal cavity, and repair of the bowel perforation is required. Any course of action other than immediate exploration, wash out, and repair, causes worsening peritonitis, sepsis, and possible death. Dr. Morales's failure to recommend surgical exploration and repair of Sam's bowel perforation upon its diagnosis caused Sam's condition to deteriorate and allowed for the continued leakage of bowel contents into the peritoneal cavity. Without a repair of Sam's bowel perforation, bowel contents continued to flow into Sam's peritoneal cavity "with all the bacteria, chemicals[,] and irritants [that] allow[] [an] infection to grow and worsen." The bowel leakage caused severe damage to Sam's physiology and permanent residual damage, and it

66

allowed for Sam's peritonitis and sepsis to grow worse. And because Sam's infection was allowed to grow, this led to a more complicated recovery process for Sam, a longer hospital stay, and long-term damage. Sam could not recover from the bowel perforation until it was actually repaired.

Further, during the surgery to repair Sam's bowel perforation, a diverting ileostomy had to be performed. The ileostomy was required because of the marked inflammatory reaction to bowel leakage for an extended length of time, i.e., four days after the bowel-perforation diagnosis and ten days after Sam's initial surgery. Had the bowel perforation been repaired at the time it was diagnosed, a colostomy would have been possible.

Sam has the burden of establishing that Dr. Paine has "knowledge, skill, experience, training, or education" about whether Dr. Morales's breach of the standard of care—by failing to recommend immediate surgical exploration and repair of the bowel perforation upon its diagnosis on the sixth day after Sam's surgery—caused Sam's claimed injury, harm, or damages. *See Brooks*, 2017 WL 127867, at *6 (internal quotations omitted); *Vora*, 473 S.W.3d at 869–70; *see also Cornejo*, 446 S.W.3d at 121 (plaintiffs required to establish expert qualified on basis of knowledge, skill, experience, training, or education to offer opinion concerning causal link between alleged breaches of standard of care and injuries suffered);

*Burrell*, 230 S.W.3d at 757, 762 (party offering witness as expert must establish witness is qualified).

In his expert reports, Dr. Paine states that he is a licensed physician and is board certified in obstetrics and gynecology. He has been practicing in the field of obstetrics and gynecology for thirty-five years. Currently, he is a member of the teaching faculty as an associate professor in the department of obstetrics and gynecology at the University of Texas Health Science Center in San Antonio. In his position as an associate professor, he trains residents and students in obstetrics and gynecology,

Dr. Paine is actively practicing medicine in the field of obstetrics and gynecology, and he was practicing medicine at the time Sam's claims arose. Dr. Paine has extensive experience in the field of obstetrics and gynecology, and he, as part of his medical practice, has performed thousands of hysterectomies during his career. He has knowledge of the accepted standards of medical and surgical care required for patients needing hysterectomies. This includes knowledge of the standards of pre-operative, inter-operative, and post-operative care required for patients who have hysterectomies.

When Dr. Paine treats patients requiring hysterectomies, he provides pre-operative, inter-operative, and post-operative care to his patients. Post-operative care includes "following [a] patient after [a] surgery is complete[] to diagnose and

treat any complications that may arise from the surgical procedure." This case involves the purported failure of appellants, including Dr. Morales, to appropriately care for and treat Sam after a hysterectomy, and Dr. Paine is familiar with the type of post-operative care a patient, such as Sam, should receive and how post-operative complications, like those experienced by Sam, should be managed and treated.

We conclude that Dr. Paine's expert reports and CV demonstrate that he is qualified to offer an opinion on the causal link between Dr. Morales's alleged breach while providing post-operative care after Sam's hysterectomy and Sam's injuries, harm, and damages. *See Jassin*, 2012 WL 5974020, at *5 ("We cannot say that the trial court abused its discretion in . . . finding that Dr. Branch is qualified to provide an expert report on causation for the complications that allegedly arose from Dr. Jassin's post-operative care following a sinus surgery that Dr. Branch says he has performed approximately 200 times, along with providing the follow-up care for those surgeries."); *Chavez*, 2007 WL 595134, at *3–4 ("It is axiomatic that a physician trained to perform a surgery is also trained to manage surgical complications."); *Keo*, 76 S.W.3d at 733 (holding physician who regularly performed surgery on head and neck was qualified to give opinion about issues common to all surgeries, including treatment of post-operative infections); *see also Alvarez*, 382 S.W.3d at 630 ("[A] physician needs only to show how he is qualified to opine on the cause of the plaintiff's injury."). Further, because Dr. Morales did

not dispute in the trial court that Dr. Paine is qualified to offer an opinion on the standard of care as to Dr. Morales, it would have been reasonable for the trial court to have concluded that Dr. Paine is qualified to offer an opinion on Dr. Morales's failure to meet the standard of care and the resulting harm. *See Healy*, 2021 WL 603369, at *2 n.1; *Legend Oaks-S. San Antonio*, 2015 WL 693225, at *5; *Jassin*, 2012 WL 5974020, at *5; *Payne*, 2011 WL 5830469, at *7; *Arnett*, 339 S.W.3d at 927–28.

We hold that the trial court did not err in overruling Dr. Morales's objections and denying Dr. Morales's motion to dismiss Sam's health care liability claim against him on the ground that Dr. Paine is not qualified to offer an opinion on causation related to Dr. Morales.

We overrule the remaining portion Dr. Morales's sole issue.[23]

## C.  Vicarious Liability of West Houston Radiology and Radiology Partners

In the remaining portion of their sole issues, West Houston Radiology and Radiology Partners argue that the trial court erred in overruling their objections to Dr. Paine's expert reports and denying their motions to dismiss Sam's vicarious liability health care liability claims against them because Dr. Paine is not qualified to offer an opinion on causation related to Dr. Morales.

---

[23]  Due to our disposition, we need not address Dr. Morales's request for attorney's fees and costs. *See* TEX. R. APP. P. 47.1.

In her petition, Sam alleges that West Houston Radiology and Radiology Partners are vicariously liable for the conduct of Dr. Morales. Generally, when a plaintiff brings health care liability claims against more than one defendant physician or health care provider, the expert report must set forth the standard of care and breach of the standard of care as to each defendant and explain the causal relationship between each defendant's individual acts or omissions and the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *Seton Family*, 593 S.W.3d at 792; *Pena*, 530 S.W.3d at 175. Yet, when a plaintiff brings a health care liability claim based on a vicarious liability theory against a defendant health care provider, an expert report that adequately implicates the actions of that party's agent or employee is sufficient as to the defendant health care provider. *Gardner*, 274 S.W.3d at 671–72; *Seton Family*, 593 S.W.3d at 792; *see also Owens*, 478 S.W.3d at 191 ("[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory." (alteration in original) (internal quotations omitted)). In other words, when a health care liability claim against a defendant health care provider is based on vicarious liability, an expert report that meets the statutory standards as to an agent or employee is sufficient to implicate the health care provider's conduct. *Potts*, 392 S.W.3d at 632; *Seton Family*, 593 S.W.3d at

71

792; *see also Owens*, 478 S.W.3d at 191–92 (expert report that is sufficient as to employee or agent, whose alleged negligent conduct vicarious liability claim was based, is also sufficient as to employer health care provider).

Having held that the trial court did not err in overruling Dr. Morales's objections to Dr. Paine's expert reports and in denying Dr. Morales's motion to dismiss Sam's direct liability health care liability claim against him because Dr. Paine's expert reports meet the requirements of chapter 74 related to Dr. Morales, we hold that Sam may also proceed on the vicarious liability health care liability claims against West Houston and Radiology Partners which are based on the conduct of Dr. Morales. *See Potts*, 392 S.W.3d at 632; *Gardner*, 274 S.W.3d at 671–72; *Owens*, 478 S.W.3d at 191–92; *see also George*, 261 S.W.3d at 295 ("[I]f the expert report is sufficient as to the claims against Dr. Ward, and we have held that it is[,] . . . then the report is sufficient as to [the] claims against CND that are based on Dr. Ward's alleged negligence.").

We overrule the remaining portions of West Houston Radiology's and Radiology Partners' sole issues.[24]

---

[24] Due to our disposition, we need not address West Houston Radiology's and Radiology Partners' requests for attorney's fees and costs. *See* TEX. R. APP. P. 47.1.

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Landau and Countiss.